COURT OF APPEALS OF VIRGINIA


Present:   Judges Bumgardner, Kelsey and Senior Judge Hodges


NATHAN BOYD, SR.

                                                          MEMORANDUM OPINION*
v.        Record No. 2399-04-4                                PER CURIAM
                                                              MAY 3, 2005
FAIRFAX COUNTY DEPARTMENT OF
 FAMILY SERVICES


                   FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                             Gaylord L. Finch, Jr., Judge

          (Jean Galloway Ball, on brief), for appellant.

          (David P. Bobzien, County Attorney; Peter D. Andreoli, Jr., Deputy
          County Attorney; Dennis R. Bates, Senior Assistant County
          Attorney; Corinne N. Lockett, Assistant County Attorney, on brief),
          for appellee.

          No brief for the Guardian *ad litem* for the infant child.


        Nathan Boyd, Sr. appeals from the trial court's decision terminating his residual parental

rights to his minor child pursuant to Code § 16.1-283(C)(2).  Boyd contends the trial court erred in

determining he was provided with the appropriate assistance to remedy the conditions which led to

the placement of the child in foster care, in finding he was unwilling or unable within a reasonable

time to substantially remedy the conditions which led to the placement of the child in foster care,

and in finding the goal of adoption was in the child's best interest.  Upon reviewing the record and

briefs of the parties, we conclude this appeal is without merit.  Accordingly, we summarily affirm

the decision of the trial court.  See Rule 5A:27.

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991). So viewed, the evidence proved that the child was born on September 22, 2001, and when he was five days old, the Fairfax County Juvenile and Domestic Relations District Court (JDR court) granted Fairfax County Department of Family Services (DFS) protective supervision of the child. The protective order was based upon the mental health and substance abuse issues of the child's mother, Keron Mills, and Boyd's limited parenting skills due to his mild mental retardation. In October 2001, the JDR court transferred custody of the child to DFS. DFS filed an initial foster care plan with the goal of return to home. Mills and Boyd were ordered to complete certain treatments, evaluations and assessments. In June 2002, when the court reviewed the foster care plan, both parents had completed a parent nurturing class, were involved in intensive home-based services and had completed the first of three parent-child assessments with Dr. Katherine Anderson, a clinical psychologist. Boyd had also completed a mental health assessment. Dr. Anderson recommended that Boyd continue with home-based services and attend individualized therapy for anger management.

In November 2002, DFS filed a petition for termination of residual parental rights and a foster care plan with the goal of adoption. The residual parental rights of Mills were voluntarily terminated on April 9, 2003, but the JDR court found that DFS had not met the evidentiary burden concerning Boyd's rights and DFS changed the foster care plan to a goal of return to home. Home-based services and visitations for Boyd were increased to eight contact hours each week for a period of six months. Boyd was also ordered to continue with anger management therapy, to obtain another parent-child assessment, and to have no contact with Mills.

At the termination hearing, Dr. Anderson testified that during the second parent-child assessment, Boyd continued to show limited parenting skills and intrusive physical responses to the child, and he failed to focus on the needs of the child. Dr. Anderson testified Boyd became angry at the end of the assessment when told his visits would continue to be supervised. In September 2003, Dr. Anderson conducted a third parent-child assessment. During the assessment, when Dr. Anderson told Boyd she wanted the home-based services moved to the evenings so she could monitor his parenting skills on a different time schedule, Boyd initially refused to move the time of the services because it would "interfere with his schedule." Although Mills' parental rights were voluntarily terminated several months earlier, Boyd also told Dr. Anderson he hoped Mills could be part of the child's life in the future. Dr. Anderson testified Boyd still required significant intervention from home-based services and he continued to struggle with meeting the child's needs. Dr. Anderson testified Boyd also made unhealthy and unbalanced food choices for the child and had difficulty putting limits on the highly active child. Dr. Anderson testified Boyd was not able to consistently meet the needs of the child in any sort of primary parenting capacity, he still required supervised visits, and she did not see any change in the future.

Dr. Beverly Powell, a developmental pediatrician, examined the child when he was two years old and determined he was average to above average in cognitive and social skills. Dr. Powell testified the child showed behavioral features consistent with Attention Deficit Hyperactivity Disorder and he would require constant adult supervision along with a highly structured environment.

Divina Alston, a family counselor, supervised the home visits of Boyd with the child and helped Boyd with parenting skills. Initially, Alston met with Boyd four hours per week, but in April 2003, she met with Boyd eight hours per week. After several months of supervising visits

during the daytime, Alston asked Boyd to change the time to the evening hours, but he refused because it would "mess up [his] schedule." In December 2003, Alston asked Boyd to change the visit to four hours two days a week, but Boyd was unable to accommodate that arrangement. Alston testified she frequently had to intervene during the visits and explain the needs of the child to Boyd. Alston also had to remind Boyd to lower the tone of his voice. Alston testified Boyd was "always" resistant to any type of advice.

Kristin Whiting, a social worker with DFS, testified DFS provided Boyd with parent-child assessments, parent nurturing classes, a mental health evaluation, mental health therapy, anger management classes, a home-based counselor for intensive parenting instruction and transportation. Whiting testified that during a home visit, Boyd became verbally abusive, and on another occasion he refused to talk to her on the telephone. Whiting arranged a meeting with Boyd to discuss ways to better communicate, but Boyd failed to attend the meeting. Whiting called Boyd's house with the number he provided, but her call could not be connected. Whiting met Boyd at his house during a supervised visit with the child and Boyd stated he had missed their scheduled meeting because he was busy. Whiting testified she attempted to arrange supervised visits while Boyd appealed the lower court's order terminating his parental rights, but she had a difficult time contacting him and he could not understand why the visits needed to be supervised. Boyd's last visit with child was in January 2003, approximately five months prior to the termination hearing in circuit court.

Ajit Wettasinghe, Boyd's mental health therapist, worked with Boyd on coping skills to manage anger and stress on an individual basis for two and one-half years. Wettasinghe testified Boyd was inconsistent in keeping his appointments and he made limited progress in helping Boyd.

Essa Mack-Watt, Boyd's friend and a licensed daycare provider, testified she provided childcare in her home twenty-four hours every day. Mack-Watt lived near Boyd and offered to be the primary caregiver for the child. Mack-Watt testified Boyd could visit the child whenever he wanted, she would help teach Boyd how to care for the child, and she would not charge Boyd a fee for her services. Mack-Watt admitted she had been asked to provide DFS with certain information for a home evaluation, but she had failed to do so and DFS never conducted an evaluation of her home. Mack-Watt testified she was not aware of any special needs of the child. Boyd was unsure when he would be able to take care of the child, and there was no contingency plan for childcare if Mack-Watt could no longer take care of the child. Boyd hoped that the child would be able to live with him sometime within the next ten years.

ANALYSIS

I.

Code § 16.1-283(C)(2) requires proof, by clear and convincing evidence that (a) the termination is in the best interests of the child, (b) "reasonable and appropriate" services have been offered to help the parent "remedy substantially the conditions which led to or required continuation of the child's foster care placement," and, (c) despite those services, the parent has failed, "without good cause," to remedy those conditions "within a reasonable amount of time not to exceed twelve months from the date the child was placed in foster care." Because "'[r]easonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case," Ferguson v. Stafford Dep't of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 4 (1992), we have held that the trial judge "must determine what constitutes reasonable and appropriate efforts given the facts before the court." Id. at 338-39, 417 S.E.2d at 4 (citation omitted).

"The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal, unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted).

Boyd argues DFS failed to provide services tailored to his special needs and DFS withdrew all services from him. In this case, clear and convincing evidence proved that DFS provided Boyd with reasonable and appropriate services on an individualized basis. Following the parent nurturing class and mental health evaluation, Dr. Anderson conducted three parent-child assessments. Dr. Anderson recommended home-based parenting instruction because she believed Boyd was unable to learn appropriate parenting skills in a group class. Home-based parenting instruction was four hours per week, but was increased to eight hours per week in April 2003. The home-based visits were conducted during the daytime and were later changed to evening hours to help Boyd with the child's needs at a different time of the day. DFS offered anger management therapy through an individual therapist, as recommended by Dr. Anderson. DFS also provided transportation service and offered to meet with Boyd to provide additional support. The record does not support Boyd's argument that DFS withdrew all services from him. The record reveals that Boyd refused or resisted the services and advice offered by DFS.

## II.

Boyd argues he accepted all the assistance offered by DFS and there was no basis for the trial court to determine that he was unwilling or unable to substantially remedy the conditions which led to placement of the child into foster case. In this case, clear and convincing evidence proved Boyd failed to remedy the conditions. Dr. Anderson testified that despite the services provided to Boyd over two and one-half years, he was not able to consistently meet the needs of the child in any sort of primary parenting capacity, he still required supervised visits, and she did

not see any change in the future. Boyd's attendance at individual therapy for anger management was inconsistent and sporadic. During a home visit by a social worker, Boyd verbally abused her and he failed to attend a meeting to discuss ways to better communicate. Boyd also refused to return the telephone calls of the social worker and failed to provide DFS with a correct telephone number. Boyd was inflexible about scheduling home-based parenting instruction and resisted advice on caring for the child. Although Boyd completed the assessments and participated in the home-care instruction, his parenting skills were still deficient and an expert believed Boyd would never be able to care for the child unsupervised. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). Merely participating in services does not meet the requirements of Code § 16.1-283(C)(2) because the statute requires the parent to remedy the conditions.

III.

Boyd argues that with continued supervision he could enjoy a relationship with the child and adoption was not in the best interests of the child.

> In determining what is in the best interests of the child, a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

In this case, clear and convincing evidence proved that adoption was in the best interests of the child. Boyd agreed that he needed help caring for the child and arranged for Mack-Watt, a friend, to be the primary caregiver for the child. However, Mack-Watt failed to provide DFS

with the necessary information for a home evaluation, and she was not aware of any special needs of the child. Boyd also failed to have a contingency plan for care if Mack-Watt was unable or unwilling to care for the child. Boyd hoped the child would be able to live with him sometime within the next ten years, and he hoped the child's mother could be part of the child's life in the future. An expert testified the child showed behavioral features consistent with Attention Deficit Hyperactivity Disorder and he would require constant adult supervision along with a highly structured environment. There was no evidence that Boyd would ever be capable of providing the constant supervised and highly structured environment the child needs. Except for a few days immediately after his birth, the child had been in foster care with the same family his entire life. The foster mother testified the child was doing well, and an examination showed he was average to above average in cognitive and social skills.

The record supports the trial court's finding that DFS presented clear and convincing evidence satisfying the statutory requirements of Code § 16.1-283(C)(2) and establishing that the termination of Boyd's residual parental rights was in the child's best interest. Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

Affirmed.